**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Oct 16 2012, 8:32 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**TIMOTHY E. STUCKY**
Blume, Connelly, Jordan, Stucky & Lauer
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**MICHAEL SPECIALE**
Indiana Department of Child Services
Fort Wayne, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of A.U., minor child, and S.U.., the mother, | ) ) ) | |
| S.U., | ) ) | |
| Appellant-Respondent, | ) ) | |
| vs. | ) ) | No. 02A05-1201-JT-13 |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable Charles F. Pratt, Judge
Cause No. 02D08-1101-JT-18

**October 16, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

S.U. ("Mother") appeals the involuntary termination of her parental rights to her child, A.U. In so doing, Mother challenges the sufficiency of the evidence supporting the trial court's judgment.

We affirm.

## FACTS AND PROCEDURAL HISTORY

Mother is the biological mother of A.U., born in April 2004.[1] The facts most favorable to the trial court's judgment reveal that in November 2009, A.U. was removed from Mother's care after she "whoop[ed]" the child with a belt, causing bruises and welts to A.U.'s arm and back. *State's Ex.* 9 at 2. Mother did this as punishment for A.U. having stabbed another child in the head when several children were left in the home without adult supervision. At the time of A.U.'s removal, the local Allen County office of the Indiana Department of Child Services ("ACDCS") also learned that Mother was homeless, had been living with friends, and had prior criminal convictions for theft and receiving stolen property. Mother also admitted to "whooping" A.U. with a belt on previous occasions and to needing parenting classes and other information "regarding alternative forms of discipline." *Id.*

Following a hearing in December 2009, Mother admitted to the allegations of an amended CHINS (child in need of services) petition, and A.U. was so adjudicated. A dispositional hearing was held the same day. The trial court thereafter issued an order formally removing A.U. from Mother's care and custody and incorporating a Parent Participation Plan ("PPP") directing Mother to successfully complete a variety of tasks

---

[1] The parental rights of A.U.'s biological father, who is unknown, were terminated by the trial court in its December 2011 termination order. The unknown father does not participate in this appeal.

2

and services designed to improve her parenting skills and facilitate reunification with A.U. Among other things, Mother was ordered to: (1) refrain from criminal activity; (2) maintain clean, safe, and appropriate housing; (3) obtain and maintain suitable employment; (4) attend and successfully complete parenting classes; (5) refrain from the physical discipline of A.U. at all times; (6) submit to a psychological examination and follow all resulting recommendations; (7) establish paternity of A.U.; and (8) exercise regular supervised visitation with A.U. as directed by ACDCS.

Mother initially began participating in several court-ordered services. In February 2010, however, she tested positive for marijuana during a family functioning assessment. Based on this positive result, Mother's admission to having smoked marijuana every other day until July 2009, and conflicting information as to when she last used marijuana, Mother was referred for substance abuse education and testing with Caring About People, Inc. ("CAPI"). Despite her participation in substance abuse education, Mother tested positive on thirty-three drug screens from February 2010 through December 2010. When confronted with these positive drug screens, Mother denied using illegal substances and insisted there must have been errors in the lab reports. Mother's referral to CAPI for substance abuse treatment was eventually closed as unsuccessful in December 2010. Mother continued to test positive for marijuana on all subsequent drug screens performed by ACDCS caseworkers from January 2011 through May 2011.

Meanwhile, in August 2010, Mother submitted to a psychological evaluation. Psychologist Danielle Wardell ("Dr. Wardell") evaluated Mother's test results, which indicated Mother struggles with borderline intellectual functioning comprised of below-average verbal abilities and low-average nonverbal skills. Dr. Wardell's diagnostic

3

impression of Mother further revealed that Mother struggles with major depressive disorder, adjustment disorder, and perpetrator abuse. Mother also has a low level of empathy, lacks nurturing skills, has a value system based on corporal punishment that requires hitting and slapping when parenting, and has broad maladaptive parenting beliefs. Based on the results of Mother's psychological evaluation, Dr. Wardell recommended that Mother be referred for individual therapy and home-based services to address her parenting deficiencies.

Mother was also psychiatrically evaluated, diagnosed with major depressive disorder, and prescribed medication. Mother did not take her medication as prescribed, however, and failed to show for her follow-up appointment. Over the course of the CHINS case, Mother also failed to progress in individual therapy. Although Mother participated in parenting classes, she was unable to recall what she had learned and failed the parenting class exit examination twice.

After more than a year of providing services to Mother with no significant improvement in her ability to parent and care for A.U., ACDCS filed a petition seeking the involuntary termination of Mother's parental rights in January 2011. A four-day evidentiary hearing on the termination petition was subsequently held in May, June, and September of 2011. During the termination hearing, ACDCS presented substantial evidence concerning Mother's failure to successfully complete and/or benefit from the many court-ordered reunification services available throughout the underlying CHINS and termination cases. In addition, ACDCS established that Mother was currently unemployed and without independent housing, continued to struggle with her addiction to

4

marijuana, and remained incapable of providing A.U. with a safe and stable home environment.

As for A.U., ACDCS presented evidence establishing that A.U. was a special needs child with below average cognitive abilities. A.U. was also diagnosed with post traumatic stress disorder, attention deficit disorder not otherwise specified, and as a victim of sexual or physical abuse. It was further established that due to the child's anxiety disorders and risk for depression, A.U. requires very specialized care with significant structure, a predictable schedule, and a stable home life in order to prevent his symptoms from worsening. At the time of the termination hearing, Mother remained unable to provide such a home for A.U.

At the conclusion of the termination hearing, the trial court took the matter under advisement. On December 13, 2011, the court entered its judgment terminating Mother's parental rights to A.U. Mother now appeals.

## DISCUSSION AND DECISION

We begin our review by acknowledging that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship

5

only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

Here, in terminating Mother's parental rights, the trial court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *L.S.*, 717 N.E.2d at 208.

The "traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *K.S.*, 750 N.E.2d at 836.

Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

(B)     that one (1) of the following is true:

6

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services; [and]

(C) that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2).[2] The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). Moreover, if the court finds that the allegations in a petition described in Indiana Code section 31-35-2-4 are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a). Mother challenges the sufficiency of the evidence supporting the trial court's findings as to subsections (b)(2)(B) and (C) of the termination statute cited above.

## I. Conditions Remedied/Threat to Well-Being

Indiana Code section 31-35-2-4(b)(2)(B) requires the trial court to find that only one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence before terminating parental rights. Here, the trial court determined that ACDCS established, by clear and convincing evidence, that there is a reasonable probability the conditions resulting in A.U.'s removal or continued placement outside of Mother's care will not be remedied. *See* Ind. Code § 31-35-2-4(b)(2)(B)(i). When

---

[2] We observe that Indiana Code section 31-35-2-4 was amended by Public Law No. 48-2012 (eff. July 1, 2012). The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

making such a determination, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.* Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. The trial court may also consider any services offered to the parent by the county department of child services and the parent's response to those services, as evidence of whether conditions will be remedied. *Id.* Moreover, ACDCS was not required to provide evidence ruling out all possibilities of change; rather, it needed to establish only that there is a reasonable probability the parent's behavior will not change. *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

Mother asserts on appeal that the "initial basis" for A.U.'s removal was her use of corporal punishment and posits that "significant progress in this regard" was made, as there was no evidence presented at trial that Mother had used corporal punishment since A.U.'s removal. *Appellant's Br*. at 7. Although Mother acknowledges that several other problems remained at the time of the termination hearing, including her ongoing use of marijuana, lack of independent housing, and failure to follow the PPP, Mother nevertheless asserts that these issues "persisted" due to Mother's "limited ability to understand and follow the PPP," and ACDCS's failure to "provide[] adequate services to

8

Mother . . . ." *Id.* Mother therefore contends that the trial court's termination order is clearly erroneous.

In terminating Mother's parental rights, the trial court made extensive findings regarding Mother's unresolved substance abuse issues, parenting deficiencies, and lack of stability. Specifically, the court found that at the beginning of the CHINS case, Mother was referred for substance abuse evaluation and treatment, parenting classes, and home-based case management services. The court went on to note that both the substance abuse treatment and home-based services referrals were later dismissed as unsuccessful, and that although Mother had completed the parenting classes, she was unable to pass the exit evaluation. The trial court also acknowledged CAPI home-based counselor Tawny Loveless's ("Loveless") testimony that Mother was "resistant to services," unable to maintain housing, and "continued to struggle" with substance abuse. *Appellant's App.* at 4. The court found that although ACDCS provided Mother with a subsequent referral for home-based services through Stop Child Abuse Now ("SCAN"), she again failed to successfully complete this referral and continued to test positive for controlled substances. The trial court also found:

> 23. Over the course of the underlying CHINS case, [Mother] has not been able to maintain stable housing. At the time evidence was closed, [Mother] was residing with her cousin in a three[-]bedroom home occupied by two adults and four children. [Mother] sleeps on the couch.
>
> . . . .
>
> 26. Rex McFarren, the child's Court Appointed Special Advocate (CASA) has concluded that termination of parental rights is in the child's best interests. In support of that conclusion, he noted that [Mother] has continued to test positive for marijuana use. She has not completed services designed to correct her parenting and she has not demonstrated an ability to maintain stable housing. The child is at risk and requires a very

9

stable environment and [Mother] has not demonstrated an ability to meet the child's special needs.

*Id.* at 4-5. Based on these and other findings, the court concluded:

2. By clear and convincing evidence[,] the court determines that there is a reasonable probability that the reasons that brought about the child's placement outside the home will not be remedied. [Mother] has been provided services through several agencies. She has not demonstrated an ability to benefit from services and has not remained drug free. She has not maintained stable housing. Although services have been attempted over the period from the child's removal up to the close of evidence in the termination case, [Mother] has not corrected the reasons for the child's removal from her care.

*Id.* at 5. Our review of the record leaves us convinced that ample evidence supports the trial court's findings cited above.

Although the evidence confirms Mother participated in several of the court-ordered reunification services, including parenting classes, a psychological examination, and some individual counseling sessions, it was the general consensus among case workers and service providers that Mother failed to achieve any significant, long-term benefit from participating in these services. For example, during the termination hearing, CAPI Clinical Director Bree Murua-Cuney ("Murua-Cuney") informed the trial court that she had administered Mother's substance abuse assessment and was involved in Mother's parenting classes and home-based case management. Murua-Cuney further confirmed that notwithstanding Mother's completion of all the required parenting sessions, CAPI workers remained "concern[ed]" regarding Mother's parenting abilities and "retention" of the information she had been taught because she had failed the exit examination twice. *Tr.* at 67. When asked to explain why Mother was discharged from the program, Murua-Cuney stated, "Because [Mother] had completed all - the whole program and they tested

10

her twice . . . [T]here wasn't much else to do unless [Mother] wanted to continue attending more parenting classes." *Id.* at 66.

As for Mother's participation in substance abuse treatment, Murua-Cuney testified that Mother was also discharged from the CAPI drug treatment program as unsuccessful due to her repeated unexcused absences. CAPI home-based case manager Loveless likewise testified that Mother had been discharged as unsuccessful from the home-based case management program in December 2010 after accruing ten "no-shows." *Id.* at 80. Loveless further reported that Mother had appeared to be resistant to "the whole program" prior to her discharge and in October 2010 told Loveless that she was "beginning to become fed up" and was "sick of services." *Id.* at 82-83.

Dr. Wardell also remained skeptical regarding Mother's ability to safely and effectively parent A.U. After detailing the results of Mother's psychological testing and the corresponding recommendations for treatment, Dr. Wardell informed the trial court of her lingering concerns as to reunification of the family stating:

> [Mother] needs to develop a working relationship with a therapist . . . so that this way she can move from the pre-contemplative stage of change, meaning that she doesn't view any problem as existing with the famil[y's] functioning, to understanding that there is a problem in the famil[y's] functioning and what her role in the famil[y's] difficulty in functioning is, um, and take responsibility for that. . . . [Mother] needs to be referred for intensive home[-]based services to address the maladaptive parenting attitudes, particularly, um, her high value in corporal punishment . . . in order to reduce the likelihood of additional involvement with [ACDCS]. She needs to be monitored as complying with this particular service prior to [ACDCS] ending their involvement. Otherwise[,] it is likely that this family will continue to function at the level they are now, um, to the point where we would see possible additional involvement with [ACDCS] at a later date.

11

*Id.* at 152. Dr. Wardell went on to explain that "although maladaptive personality traits are changeable, typically it takes a very[,] very long time . . . to the point where treatment of maladaptive personality traits can take years sometimes. . . . [A]nd unfortunately without everything going exactly as I wrote it, this family most likely will end up in Court here again. So, without significant change, I don't see reunification going very well." *Id.* at 157.

As noted above, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration the parent's *habitual patterns of conduct* to determine the probability of future neglect or deprivation of the child. *D.D.*, 804 N.E.2d at 266. Moreover, "simply going through the motions of receiving services alone is not sufficient" to show that conditions have been remedied if the services "do not result in the needed change, or only result in temporary change." *In re J.S.*, 906 N.E.2d 266, 234 (Ind. Ct. App. 2009). Where a parent's "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005).

Here, Mother "readily concedes that, due to her current living situation, the trial court did not have the option of considering placement with her at this time." *Appellant's Br.* at 14. Moreover, the record makes clear that throughout the underlying proceedings, Mother demonstrated a persistent unwillingness and/or inability to take the actions necessary to show she is capable of overcoming her addiction to marijuana and of providing A.U. with the safe, stable, and drug-free home environment that the child needs to thrive. Based on the foregoing, we conclude that the trial court's determination that

there is a reasonable probability the conditions resulting in A.U.'s removal from Mother's care will not be remedied is supported by clear and convincing evidence. Mother's assertions to the contrary, including her complaint that she failed to overcome her addiction to marijuana and obtain independent housing because ACDCS failed to provide adequate services, amount to impermissible invitations to reweigh the evidence. *See D.D.*, 804 N.E.2d at 265; *see also In re E.E.*, 736 N.E.2d 791, 796 (Ind. Ct. App. 2000) (concluding that the "provision of family services is not a requisite element of our parental rights termination statute" and "even a complete failure to provide services would not serve to negate a necessary element of the termination statute and require reversal").

## II. Best Interests

We next consider Mother's assertion that ACDCS failed to prove termination of her parental rights is in A.U.'s best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the Indiana Department of Child Services and look to the totality of the evidence. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the child. *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* Moreover, we have previously held that the recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *In re M.M.*, 733 N.E.2d 6, 13 (Ind. Ct. App. 2000).

13

In addition to the findings previously cited, the trial court made several additional pertinent findings relating to A.U.'s best interests. Specifically, the trial court noted Dr. Wardell's testimony that A.U.'s cognitive abilities are in the "below[-]average range," that he is "at risk for depression, his "attention ability is significantly skewed," and he is "not using his coping skills." *Appellant's App.* at 3. The court's findings also acknowledged that A.U. had been diagnosed with Post Traumatic Stress Disorder ("PTSD"), Attention Deficit Disorder, and has been the victim of sexual and physical abuse. Although the court found that Mother loves A.U., the court nevertheless determined that without therapy A.U. would decline "developmentally" and further noted that A.U. needs:

> an engaged and dedicated caregiver who understands what triggers the child's memories and how to calm him down. The caregiver must be able to provide a level of supervision that ensures that the child does not re-enact his past traumas. The caregiver must be able to participate in therapy with the child, develop and follow a strategy for the child's care, and must be able to provide him with a safe environment free from sexual language and teasing as well as protection from exposure to pornographic or sexually explicit materials. The caregiver must be committed to the child's recovery and be able to understand appropriate behavioral boundaries. The child requires a structured and stable environment. The caregiver must be open to mental health services and cooperate with school officials. Without appropriate care, the child will carry his negative behaviors into adulthood.

*Id.* at 3-4. Additionally, the trial court found that family therapy between A.U. and Mother "cannot be commenced until the Mother resolves her substance abuse issues, acknowledges her wrongs, and is able to address [A.U.'s] needs." *Id.* at 4. Finally, the court also acknowledged both the Court Appointed Special Advocate's ("CASA") and Guardian ad Litem's ("GAL") testimony recommending termination of Mother's parental rights as in A.U.'s best interests. These findings, too, are supported by the evidence.

14

In recommending termination of Mother's parental rights, A.U.'s therapist, Dr. Therese Mihlbauer ("Dr. Mihlbauer"), informed the court of A.U.'s significant emotional needs. Dr. Mihlbauer testified that it was "very important" that A.U.'s caregiver be able to provide a high level of structure, supervision, and effective communication with other adults, explaining A.U. is a "high maintenance kid" at a "real[ly] sensitive stage" of development where he is "already struggling" with aggression toward peers, sexually touching peers, and "getting attention in a bad way." *Tr.* at 48, 52.

Dr. Wardell's testimony echoed that of Dr. Mihlbauer, stating that although A.U. has an adequate amount of coping skills, he does not use these skills very well. Consequently, A.U. often behaves in "unpredictable ways" when stressed, "looks at his world through a narrow focus," and does not do well in "ambiguous situations." *Id.* at 128. As a result, Dr. Wardell testified that A.U. "requires" an "extremely well structured" environment or he will "really struggle." *Id.* Dr. Wardell went on to state, "Currently, it doesn't look like [Mother] would be able to provide the level of care that [A.U.] would need." *Id.* at 158.

CASA Rex McFarren and GAL Kristen Klink also both recommended termination of Mother's parental rights as in A.U.'s best interests. In so doing, the CASA testified, "[U]nfortunately, [Mother] has made no progress in being able to provide for her son [regarding] the issues that he is dealing with at this point which puts him at high risk." *Id.* at 228. The GAL further testified that A.U. was "doing well" and making "great progress" in foster care. *Id.* at 293.

Based on the totality of the evidence, including Mother's significant history of mental health issues, ongoing struggles with substance abuse, and failure to successfully

complete and/or benefit from a wealth of reunification services available to her, coupled with the testimony from Dr. Wardell, Dr. Milhbauer, the CASA, the GAL, and ACDCS case mangers recommending termination of the parent-child relationship, we conclude that there is sufficient evidence to support the trial court's determination that termination of Mother's parental rights is in A.U.'s best interests. *See*, *e.g.*, *In re A.I.*, 825 N.E.2d 798, 811 (Ind. Ct. App. 2005) (concluding that testimony of CASA and family case manager, coupled with evidence that conditions resulting in continued placement outside home will not be remedied, is sufficient to prove by clear and convincing evidence termination is in child's best interests), *trans. denied*.

This court will reverse a termination of parental rights "'only upon a showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made.'" *Matter of A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (*quoting Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Affirmed.

NAJAM, J., and MAY, J., concur.